May it please the court. I'm Arthur Catterall of the Justice Department on behalf of the Commissioner. And just to sort of put this in context, in the Sloan case that was just argued, the tax court resolved the issue of the taxpayer's transferee status under Section 6901 by reference to substance over form principles of federal tax law. Had the government prevailed on that issue, then the court would have had to decide whether that transferee status carries over to the state law liability determination. Okay, so every circuit has disagreed with that argument so far. That is correct. So maybe don't spend too much time on that issue. Okay. Well, let me just say that the courts of appeals that have held against the government on this issue have done so based on the assumption that the government's position is foreclosed by the Supreme Court's 1958 decision in Commissioner v. Stern. They said that the IRS should be treated like any other And I think that's an unwarranted extension of the Stern case. As is relevant to this case, Stern stands for the proposition that transferee status under Section 6901 is irrelevant if state law expressly provides or, I'm sorry, expressly precludes recovery against that person even if he or she were deemed a transferee. It's in that context that the Stern court stated that the government's substantive rights in this case, I emphasize in this case, are precisely those which other creditors would have under Kentucky law. And it simply does not follow that the government's rights will always be precisely the same as all other creditors. Rather, by virtue of Section 6901, the government is in precisely the same position as any other creditor of an insolvent transferor under state law. And nor is our interpretation of Section 6901 inconsistent with the notion that Section 6901 is purely procedural and does not create or define a substantive liability. Recharacterizing a transaction under federal tax law does not give rise to any substantive liability on the part of any resulting deemed transferee. That only arises if such a transferee could be held liable under state law. So let's turn to New York state law here, which is what the tax court was applying in, I guess, the Second Circuit in a virtually identical case. It's the same case. I mean, it's consolidated. Applied. And so it seems to me that the question boiled down to whether the shareholders here knew that the SHAP entity couldn't pay the taxes or have any legitimate offsetting losses. Should have known. Should have known or were on inquiry. And the Second Circuit, I was calling this the any idiot should know test. The Second Circuit in applying this test said any idiot would know that this was problematic. But the tax court in this case, which was attempting to look at the time of the transaction, thought that any idiot wouldn't know. And that, in fact, there were legitimate transactions. So why don't we have to defer to the tax court's analysis, especially since the tax court are probably better tax lawyers than the Second Circuit was. They're like us. We don't know anything. Well, the tax court may be better tax lawyers than the Second Circuit, but the Second Circuit knows a lot more about New York fraudulent conveyance law than the tax court does. But wasn't the Second Circuit saying, you know, any idiot would know that the newly formed company wouldn't have net operating losses of this sort and blah, blah, blah. It's like, well, I don't know that. I mean, how does the Second Circuit know that? What's the basis for me to determine that everyone knew that this sort of transaction was suspicious, especially with the hindsight issue? Now we can say, yes, it looks fishy. But the tax court said, no, this could have been legitimate at the time that the transaction took place. Well, but the tax court never explained. I mean, the tax court just said, oh, there's plenty of legitimate ways to get rid of the game. Should we defer to that? No, because it's not true. It's incorrect. The IRS says that's not true. And then you cite Section 269, which doesn't seem applicable by its terms. And then they say, well, some court has applied it to mean this. So sitting here, I don't know that there are no legitimate transactions. I know you've said that, but I guess it's hard for the government to prove a negative. But how do I know that as a matter of law? When I have the tax court say, oh, no, there were legitimate transactions that could have taken place. Well, I think the – I guess the relevant point is that under New York law, and I'm – again, this is going to the constructive knowledge issue. Whether a person had constructive knowledge of someone else's fraudulent scheme is a mixed question of fact and law. What the person knew and when they knew it, that's obviously – those are questions of fact. Now, whether that knowledge was sufficient to impose a duty of further inquiry is a question of law. And I noticed in the foundation's response to our Rule 28J letter, the foundation suggests that the Second Circuit should have applied a clearly erroneous standard. But the Second Circuit decided – reviewed that issue exactly the way a New York appellate court, a state appellate court would review that issue. And – The tax court had many days of hearing, right, and listened to the witnesses and the evidence and reached this conclusion about what they knew or should have known. Of course, I guess constructive knowledge is a question of law. You know, as a matter of law, somebody should have known that this was fishy or it smelled. But I'm just not sure how we're supposed to determine that. Well, I think – and I think at the very least, there was a duty of further inquiry. And I think if there had been further inquiry – They did do some due diligence, right? No, in fact, I mean, the tax court in its opinion said, you know, the shareholder representatives have conceded that they didn't look any further. So the only question is, was there a duty of further inquiry? And the Second Circuit found, as a matter of law, that there was, and that, you know – The tax court says, look, before February 2001, there wasn't this IRS notice sort of yellow flagging. I mean, I read the notice. It didn't say these transactions are always illegitimate. They just said, be aware, we think they're fishy. And that – and this transaction happened even before that notice. And the tax court said, well, before that, shareholders would not be on inquiry notice about whether Shaft's losses were legitimate or not. Well, why is that wrong? Why is that a legal issue? That specific question, whether – the Second Circuit just said that the fact that the notice was not out yet is not determinative. You know, it – But why aren't they right? You know, we don't always agree with other circuits. In fact, we enjoy standing alone sometimes. Sure. But I think if you look at the total litany of facts, you know, the fact that the notice 2001-16 was not out yet is, you know, just sort of a – it's a consideration. But in the face of all the totality of the circumstances, it's not a very big consideration. So even the IRS hadn't figured out that these things were fishy at the time the transaction happened. Well, you know, it takes a long time from, you know, when something is sort of discovered on audit, and then, you know, there's all sorts of back and forth about do we need to do something about this. So, I mean, I think the IRS was certainly aware of these transactions. The fact that the notice didn't come out for a couple of years is just because it takes a long time, you know, for notices to come out. Well, like a regular business person here that we have here, why should they be faster than the IRS on figuring out the transactions fishy? Well, because for one thing, and this is one thing that the Second Circuit focused on, was the sophistication of these taxpayers, and particularly their tax counsel. And, you know, the tax lawyer for the foundation knew about these kinds of transactions and knew they were kind of, you know, sort of a don't ask, don't tell type thing. But that does seem to be getting into factual issues, issues of credibility, issues of who knew what when. I mean, these are the sorts of things we normally defer to the trial court on. Well, but again, I think the ultimate conclusion, the legal inference that you draw from the facts, is a question of law. And I think the Second Circuit basically said, you know, we're not going to disturb any of the facts found by the tax court, but the tax court simply didn't take into account all of these red flags that should have put the shareholder representatives on inquiry notes. Now, that's what they said, but I don't know that their reasoning was so good either. Well, their understanding about the nature of the transaction, it was more than sufficient to demonstrate an awareness that Chapter 2 was a shell that didn't have legitimate offsetting losses. Why? Why was that? I'm sorry, why was? Why was it more than sufficient? And the Second Circuit doesn't really explain that. Tell us what they concluded. When you've got a brand new shell entity that obviously doesn't have any tax attributes, and when the shareholder representatives knew that the underlying securities were already under contract to be sold to Morgan Stanley, and they knew that the purchase. But that doesn't matter, right? The only thing that matters is whether the losses were legitimate that could offset the gains, right? Because. I don't think that's all that matters. They certainly have a right to tax avoidance, as the tax court said. And if they enter into a transaction that would minimize taxes because the corporation has legitimate offsetting losses, nothing wrong with that. That wouldn't be fraudulent. But we're talking about a shell entity here. There's no way this brand new off-the-shelf entity could have gotten rid of. So that requires a knowledge of tax law to say there's no way it could have had offsetting losses. Well, I don't know about that. Well, and these people had very sophisticated tax accounts. So that's a question of fact that the tax court could evaluate. Well, again, I mean, whether these people were. . . And what they should have known at the time this transaction took place seems like a fact question that the tax court found. They weren't on inquiry knowledge. I mean, the ultimate determination of whether there is a duty to inquire is a legal inference drawn from the facts. And that's New York law. That took you way over your time. So do you want to save the rest of the time? Certainly. Okay. Good morning, Your Honors. And good morning, Judge Noonan. Wish we could see your face. Dwayne Weber for Salus Mundi Foundation. May it please the Court. . . . to affirm the decision of the tax court. The tax court could have ruled in favor of Salus Mundi Foundation on any of at least four separate grounds. First, that there's no tax liability at all for a period ended July 2, 1990. So the problem I have is that the Second Circuit bound against you. I mean, it's the same case as opposing counsel said. And in the Ninth Circuit, although we do take pride in standing alone, our rule, our binding circuit precedent says we won't create a circuit split unless there's extraordinary reasons to do so. So why shouldn't we just follow the Second Circuit? There would have to be a really good reason why we wouldn't do that. Respectfully to the Second Circuit, Your Honor, the really good reason is that the Second Circuit is wrong. The second reason is that this Court defers to the finder of fact and not to a circuit that. . . You said that the Second Circuit found against the taxpayer. And that's what the Second Circuit did. It said there was no clear error in any of the findings of fact that Judge Goki reached. But nonetheless, the Second Circuit concluded not that Judge Goki made a fundamental error of law, so we should send it back for him to apply the proper law to the facts that he has found. Instead, they imposed their own view of the facts. They did not defer to Judge Goki's view of the facts. But isn't constructive notice an issue of law? I mean, so the Second Circuit is saying as a matter of law, the undisputed facts here puts a reasonable person on inquiry notice. I mean, that was their ruling, and that's a legal ruling. And their ruling, Your Honor, is based on essentially three assertions of fact. And those assertions are all wrong. The first one was the Court focused on some language that was in one of the many draft stock purchase agreements that were exchanged between counsel for the parties. This was language that the judge and counsel for the commissioner didn't find sufficiently interesting to even raise during the trial with the very counsel that struck the language from the agreement. And that language made a reference to Merrill Lynch and a possible security interest. And inasmuch as the counsel for the sellers had no knowledge of or participation in any arrangement with Merrill Lynch, who, by the way, never ended up being a party to any transaction with the purchaser, that they moved to strike that language. The Second Circuit read something into that language that was somehow untoward. The most you can read into the striking of that language is that counsel didn't deem it to be appropriate to be part of a sale of stock by the selling shareholders to the purchasers. But the most that it gives right. I'm sorry. You're arguing, are you not, that the Second Circuit got it wrong in its application of New York law to the facts of the same transaction we have here? Well, Your Honor, with respect to the legal approach that the Court took was to say that there was a duty of inquiry based on the facts that it observed. But the facts that it cited in its opinion as a basis for reaching that conclusion of law were the one that I've just mentioned and then two more. One that the Court focused on. But that fact just went to did the shareholders understand what the deal was? And really the issue is whether they should have known that double D SHAP entity didn't have offsetting losses. I mean, that seems to be or couldn't possibly have legitimate offsetting losses. And there the Second Circuit said any idiot would know that this newly formed corporation couldn't have offsetting losses. I mean, that was essentially its holding. And that was just based, it seems, on its understanding of corporate tax law. Well, as your question to counsel for the Commissioner implied, it's hard to know what that holding was based on or that conclusion of the Second Circuit. But it's a legal conclusion, right? And so why is that wrong? Your Honor, I don't think it's a legal conclusion to say that representatives of a selling shareholder, sophisticated legal counsel, very aware of the many kinds of transactions that a purchaser can engage in that can generate losses, particularly a purchaser that is a consolidated group of companies, that as a matter of law always conclude that there must be a fraud at the end of the purchaser's activities here. So the objective, you know, a reasonable, sophisticated tax person would not. I mean, that's sort of what the Second Circuit is saying. In 1999, Your Honor, a reasonable, sophisticated tax lawyer would have concluded that there were plenty of things that the purchaser could do, based on everything that the sellers knew at the time, July 2, 1999, that the purchaser could do to deal with the assets of Double D Ranch. Now, the opposing counsel says, just as a matter of fact, there wasn't anything. As a matter of fact and law, there was nothing. There was no way to have legitimate offsetting losses. And in your brief, I don't know that you gave, like, chapter and verse of all the legitimate ways they could have gotten offsetting losses. We did not, Your Honor, and it isn't our burden to do so. The burden is on the commissioner to establish, first, the existence of a fraudulent scheme. That hasn't even been established here. The existence of a federal income tax liability, that hasn't been established, certainly not as of July 2. Well, weren't the losses disallowed, or am I thinking of the other case? There were no losses disallowed, Your Honor. In fact, the commissioner did not pursue a case with respect to the purchaser. The purchaser filed an income tax return for its period into June 30, 2000, on a timely basis, reported the gain from all of the sales of stock, and also reported a loss. That tax return was not adjusted, and the commissioner did not pursue imposition of liability with respect to the purchaser. There is no determination that the losses reported on that tax return were not genuine, bona fide losses. That's an allegation made in the briefs by the commissioner. But there was no evidence submitted to the court. The only evidence before the tax court relating to those losses was the actual information on the tax return for June 30. The commissioner chose not to bring into the courtroom representatives of the purchaser. They were standing right outside the courtroom. The commissioner had the burden of proof. The commissioner chose not to bring them in. We think you should infer from that that what they would have said is they believed that those transactions, to the extent that they had even contemplated them at the time of the purchase, were perfectly legitimate transactions. The key point here, though, is you can't presume from knowledge that the purchaser may sell some or all of the assets shortly after the purchase of stock, that therefore the purchaser is going to engage in a particular transaction to give rise to losses, or that that particular transaction would be an illegitimate one or a fraudulent one. So the note in the opposing counsel said that Schaaf's losses were part of this son-of-boss type scheme, and you're saying that that's just an allegation. It's a pure allegation. There's absolutely nothing in the record. I mean, son-of-boss is a very particular characterization for a particular set of steps that are deemed to be, by most courts, illegitimate. And it has a label, son-of-boss, but you have to know what the steps were that were engaged in by the taxpayers in order to apply that label. There are all kinds of labels that we know today applied to various transactions that certain parties entered into through the very late 90s and into the early and mid-2000s, you know, coins, blips, all these different labels. There is no label that you can affix to this one, because all we have is a tax return that shows a basis in an asset, a date of acquisition, and a sales price or a resolution price on another date. And that is absolutely the only information in the record about these losses. I want to make sure we understand each other on what your burden is here. Do you agree that under Ninth Circuit law, in view of the Second Circuit decision, that's a tax decision of another circuit based on the same transaction, that your burden would be to persuade us that that decision of the Second Circuit is demonstrably erroneous or there appear cogent reasons for rejecting them? That's the test, as I understand it, in the Ninth Circuit. Do you agree that that's what you've got to persuade us of? No, Your Honor, I don't. I think that, first of all, it was the Second Circuit that created a split, because one of the other alleged transferees in this case, the Series Foundation, also prevailed in the tax court, same opinion, different decision. The Commissioner didn't appeal that case. It would have been appealable to the Fourth Circuit, where the Circuit Court had already issued its opinion in Steirns, holding on a similar factual basis, that to the extent there was any duty of inquiry, at the end of that inquiry the taxpayers wouldn't have learned anything new, wouldn't have learned anything about any fraudulent transaction. By not appealing, though, they cleverly avoided having a case going the other way. So, I mean, we are just dealing with the Second Circuit opinion here. Well, I don't believe that there's any Ninth Circuit case law that compels a conclusion that in these circumstances you have to follow the Second Circuit. I certainly understand the logical appeal of your point, Your Honor. And, as I said, we're happy to demonstrate it. It's not just logic. I'm quoting from Leacher v. Commissioner, 481 Federal 2nd, 717 at 720. It says, The tax decisions of other circuits should be followed unless they are demonstrably erroneous or there appear cogent reasons for rejecting. That's all I'm saying. Your Honor, as I said, it is absolutely, clearly erroneous. It's wrong. It's wrong for the reason that I've already articulated. But they supplanted their own perception of facts. They also assumed that there was a federal income tax liability. And Judge Gokey found in his opinion that there was no liability as of July 2nd, 1999, which is the date on which the stock was sold. The Second Circuit didn't find that factual conclusion to be clearly erroneous. Your Honor, there are over 400 stipulations of fact in this case. Judge Gokey reviewed all of those. He also was at the trial. Now, Judge Gokey has a very engaging style. He was a tax litigator for the IRS for many years and then in private practice. So his style on the bench is to look each witness in the eye and ask the questions that he wants to ask. And that's what he did in this case. And he concluded, based on the colloquy with each of the witnesses, including Dick Dieter, who was the tax advisor to the selling shareholders, that the knowledge that they had, including knowledge of potential transactions that the purchaser might enter into, both sale of assets or generation of losses, that there were legitimate techniques available and that they didn't have to inquire further. But if you take the Second Circuit's suggestion that they should have inquired further, then you would have to ask the question, well, what would the selling, the shareholders' representatives have learned had they inquired further? What would the purchaser have said to the selling shareholders if they asked, well, how do you intend to deal with the theoretical tax that would otherwise arise on the gain, but for any tax attributes you might have? What are those tax attributes? It's highly unlikely that the person, this is what the Starnes Court held in the Fourth Circuit, highly unlikely that the purchaser would have said, well, we intend to engage in a fraudulent loss scheme. Instead, they probably would have said it's none of your business, we're the purchaser. But the most important point here is the burden of proof was on the Commissioner to establish what that duty of inquiry might have yielded. And the Commissioner didn't bring in anyone from the purchaser to say what the purchaser, what the purchaser's plans were when they engaged in the transaction. The Second Circuit seemed to think that any just basic due diligence would have uncovered that there wasn't any legitimate tax attribute. And since the tax liability could have boomeranged back to the shareholders, I mean, that would have been a reasonable due diligence exercise to engage in for the shareholders. I mean, that's what the Second Circuit is indicating. The Second Circuit's conclusion, Your Honor, respectfully, is a classic illustration of why appellate court judges should defer to finders of fact. What the Second Circuit did is it made a broad, sweeping generalization that because the selling shareholders decided to sell their stock, which they didn't have to do, by the way, the evidence in the tax court was that they would never have sold the assets. That wasn't a binary choice. They either sell the assets or I sell the stock. They chose to sell their stock. And according to the Second Circuit, by having chosen to sell the stock and therefore put on somebody else dealing with the corporate-level liability that theoretically attends so-called built-in gains, that thereby they set upon a path that necessarily was fraudulent. And that's just wrong. I think we have your argument. Thank you, Your Honor. Thank you. Thank you. First, on the issue of the prior drafts of the stock purchase agreement, counsel indicated that it refers to Merrill Lynch, who wasn't even involved. That's not right. It refers to Morgan Stanley by name, provided that this limitation shall not apply to any arrangements the purchaser may have with Morgan Stanley with respect to the purchase by Morgan Stanley of the securities from the company. Further states that purchaser may assign its rights and interests under the agreement to Morgan Stanley as additional, I'm sorry, as collateral security for purchaser's obligation to deliver the securities to Morgan Stanley following the closing for purposes of resale. So, you know, the deal with Morgan Stanley was everybody knew what was, you know, what was happening, what was going to happen immediately after the closing. And then you have this situation where, for some reason, they couldn't close the double-D stock sale on the right day. And so Morgan Stanley comes in and says, you know, where are my securities? And Bessemer had to intervene at the highest levels with Mr. Mack, John Mack, I believe, the former head of Morgan Stanley, to get Morgan Stanley to back off. So the fact that these two transactions are so inextricably intertwined is enough. I think the Second Circuit basically said given this level of relationship between the two transactions, there should have been further inquiry. Thank you. All right. The case of Salas Mundy Foundation versus Commissioner is submitted.
judges: Albritton, Noonan, Ikuta